Charles Barker III
1548 E 30th
Portland, Oregon 97214
mortgagerecon@gmail.com
Plaintiff in Pro Se

FILED 29 DEC '14 13:25 USDC-ORP

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

CHARLES BARKER III

        Plaintiff

    v.

UNITED STATES NATIONAL BANK, aka   )
U.S. NATIONAL BANK, U.S. BANCORP,   )
U.S. BANK AS TRUSTEE FOR GREENPOINT  )
MORTGAGE FUNDING TRUST MORTGAGE  )
PASS-THROUGH CERTIFICATES SERIES AR4, )
OCWEN LOAN SERVICING INC., ALLY BANK, )
ALLY FINANCIAL, MORTGAGE ELECTRONIC )
REGISTRATION SYSTEMS aka MERS,    )
BANK OF AMERICA, CITIBANK N.A. AS   )
INDENTURE TRUSTEE FOR BEAR STEARNS  )
LIEN TRUST 2007-1,          )
        And DOES 1-25        )

        Defendants       )

**3 '14 - CV - 2050 . AC**
**CIVIL CASE No. _____**


**COMPLAINT**

Comes Now Plaintiff CHARLES BARKER III and files this Complaint, for Defendants'

violations of multiple state and federal laws, unlawful foreclosure, and financial damages and

emotional injury which have been inflicted upon the Plaintiff by each of Defendants.

As Plaintiff appears pro se, the terms "Plaintiff", "Barker" and first-person terms "I",

"my", and "me" are used interchangeably throughout to refer to the Plaintiff.

#60277

## CONTENTS

INTRODUCTION

JURISDICTION AND VENUE

SCHEDULE OF PARTIES

LITIGATION OVERVIEW

SUMMARY STATEMENT OF FACTS

CHASE / JPMC RENEGED ON PAYMENT PLAN AGREEMENT; ARGUMENT

FIRST CAUSE OF ACTION – FRAUD

SECOND CAUSE OF ACTION – VIOLATIONS OF ORS 86.060 et seq

THIRD CAUSE OF ACTION -UNFAIR, DECEPTIVE and FRAUADULENT PRACTICES

FOURTH CAUSE OF ACTION – VIOLATIONS OF U. S. SECURITIES LAWS

FIFTH CAUSE OF ACTION - BREACH OF FIDUCIARY RESPONSIBILITY

SIXTH CAUSE OF ACTION – FAIR DEBT COLLECTION PRACTICES ACT

SEVENTH CAUSE OF ACTION – VIOLATION OF RACKETEER INFLUENCED &

    CORRUPT ORGANIZATIONS ACT

EIGHTH CAUSE OF ACTION – CONVERSION

NINTH CAUSE OF ACTION – RESTRAINT OF TRADE & PUBLIC POLICY

TENTH CAUSE OF ACTION – OBSTRUCTION OF JUSTICE

ELEVENTH CAUSE OF ACTION – WRONGFUL FORECLOSURE / QUIET TITLE

TWELFTH CAUSE OF ACTION – UNFAIR TRADE PRACTICES

THIRTEENTH CAUSE OF ACTION – RESPA VIOLATIONS

FOURTEENTH CAUSE OF ACTION – UNFAIR & BAD FAITH DEALING

FIFTEENTH CAUSE OF ACTION – CONSUMER PROTECTION ACT –

    TRUTH-IN-LENDING

SIXTEENTH CAUSE OF ACTION – FAIR DEBT COLLECTION PRACTICES ACT

SEVENTEENTH CAUSE OF ACTION – UNJUST ENRICHMENT

EIGHTEENTH CAUSE OF ACTION – CONTRACT OF ADHESION

CONCLUSION

PRAYER FOR RELIEF

## INTRODUCTION

1. This is a case involving wrongful attempted foreclosure, by a deceptively layered consortium of banks and their complicit entities and agents who have engaged in a multiplicity of deceptive and flagrantly illegal schemes and practices, all designed to leverage their monetary profits, at the expense of United States taxpayers and to the extreme prejudice and harm to the Plaintiff Charles Barker III herein.

2. I originally purchased this residential property for my daughter, a student at the University of Oregon, in 2004, made the down payment from family savings, and I have since invested many thousands of dollars in improvements to the subject property, including insulation, laundry room addition, brick patio, exterior painting, interior painting, window upgrades, etc. together aggregating over $75,000.00 in cash invested in purchase and upgrades. This is a modest residential property, close to the University of Oregon college campus.

3. It is unconscionable that a consortium of mega-financial institutions[1] - who view a home mortgage as mere "financial instrument"; a commodity that they routinely buy and sell on 'secondary markets' that are invisible and inaccessible to the homeowner, be allowed to pursue a foreclosure and to eject people from their home, all to monumentally profit the banks.

## JURISDICTION AND VENUE

4. Jurisdiction arises out of diversity of citizenship under 28 U.S.C. 1332 as the Plaintiff resides in the State of Oregon and Defendants are domiciled in and/or incorporated in other states, including Minnesota (U.S. Bank), Florida (Ocwen Loan Servicing), Michigan (Ally Bank), Utah (Ally Financial), Virginia (MERS), North Carolina (Bank of America) and New York (Citibank).

5. Jurisdiction also exists due to certain actions of Defendants which have occurred in states throughout the United States, including alleged transfers of ownership of the mortgage and/or deed of trust, interstate transfers of securities instruments related to the subject note and deed of trust, interstate transfers of depository funds, and clandestine execution of documents related to these transactions in as-yet unknown locales.

6. This Court has supplemental jurisdiction under 28 U.S.C Sec 1367 over the Oregon state claims, including ORS Sec 86.060 et seq, which are closely related to federal claims, and form part of the same case or controversy under Article III of the United States Constitution.

7. There are United States Federal laws which are at issue in the instant matter, including Securities Laws (the Securities Act of 1933, as amended) and Interstate Trade Law violations. Jurisdiction over the subject matter of this action lies with this Court pursuant to Section 17(a) (2) and (3) of the Securities Act of 1933, which cannot be heard by a state court.

8. Jurisdiction also arises out of 15 U.S.C. Sec 1640 (e) of the United States Consumer Credit Protection Act, action may be brought in U.S. District Court.

9. Jurisdiction also arises out of 18 U.S.C. 1961 (a) authorizing proceeding in U.S. District Court under the Racketeer Influenced and Corrupt Organizations Act.

10. All of the matters of this lawsuit concern a residential property located within the State of Oregon; however, none of the Defendants have their corporate domicile in Oregon. Consequently, the conduct of all activities has occurred in multiple states of the United States, including Minnesota, Florida, Michigan, Utah, Virginia, North Carolina and New York.

11. As a consequence of all of the foregoing: Federal District Court in the District of Oregon is the correct jurisdiction and venue.

## SCHEDULE OF PARTIES

Plaintiff:
Charles Barker III
1548 SE 30th Avenue
Portland, Oregon 97214

Defendants:
UNITED STATES NATIONAL BANK, aka U.S. Bank and US Bancorp (herein, "US Bank")

| Portland Main Office: | Corporate Headquarters: |
|---|---|
| 309 SW 6th Avenue | 800 Nicollet Mall |
| Portland, Oregon 97204 | Minneapolis, Minnesota 55402 |

OCWEN LOAN SERVICING LLC (herein, "OCWEN")
        1661 Worthington Road; Suite 100
        West Palm Beach, Florida 33409-6493

ALLY BANK (herein "ALLY")
        Headquarters Office
        P.O. Box 200
        Detroit, Michigan 48265-2000

ALLY FINANCIAL (herein "ALLY")
        Headquarters Office
        P.O. Box 725
        Midvale, Utah 84047

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS (aka and herein, "MERS")

| Corporate Offices: | Registered Agent: Sharon McGann-Horstkamp |
|---|---|
| 1818 Library Street, Ste 300 | 1818 Library Street, Ste 300 |
| Renton, Virginia 20190 | Renton, Virginia 20190 |

        Note: While corporate offices located in Virginia, MERS is registered in Delaware

BANK OF AMERICA  (herein "BofA")
        Corporate Offices
        100 North Tryon Street
        Charlotte, North Carolina 28255

CITIBANK (herein "CITI")
        399 Park Avenue
        New York, New York 10043

12. Defendant **US Bank** is a company that acts, or pretends to act, variously as a) owner of the Note, or b) as a trustee for banks, trusts or for investors in securitized transactions, or other partially disclosed, unknown, undisclosed or unidentified owners or purported owners of the Note and/or mortgage trust deed.

13. Defendant **US Bank as Trustee for Greenpoint Mortgage Funding Trust Mortgage Pass-through Certificates Series 2006-AR4** is a company that acts, or pretends to act, variously as a) owner of the Note, or b) as a trustee for banks, trusts or for investors in securitized transactions, or other partially disclosed, unknown, undisclosed or unidentified owners or purported owners of the Note and/or mortgage trust deed.

14. Defendant **OCWEN** is a company that acts, or pretends to act, variously as a) "servicer" of the Note, or b) owner of the Note, or  c), as a trustee for banks, trusts or for investors in securitized transactions, or other partially disclosed, unknown, undisclosed or unidentified owners or purported owners of the Note and/or mortgage trust deed.

15.Defendant **Ally Bank** is a company that acts, or pretends to act, variously as a) owner of the Note, or b) as a trustee for banks, trusts or for investors in securitized transactions, or other partially disclosed, unknown, undisclosed or unidentified owners or purported owners of the Note and/or mortgage trust deed.

16. Defendant **Ally Financial** is a company that acts, or pretends to act, variously as a) owner of the Note, or b) as a trustee for banks, trusts or for investors in securitized transactions, or other partially disclosed, unknown, undisclosed or unidentified owners or purported owners of the Note and/or mortgage trust deed.

17. Defendant **Bank of America** is a company that acts, or pretends to act, variously as a) owner of the Note, or b) as a trustee for banks, trusts or for investors in securitized

transactions, or other partially disclosed, unknown, undisclosed or unidentified owners or

purported owners of the Note and/or mortgage trust deed.

18. Defendant **Citibank** is a company that acts, or pretends to act, variously as a) owner

of the Note, or b) the entity having authority to negotiate modifications to the note; specifically

the payment plan set forth in their October 12, 2009 letter.

19. Defendant **MERS** is not yet known, ad only through discovery will it be revealed, if

the subject mortgage is registered on the MERS registry, or whether MERS was involved with

any of the alleged transfers or assignments. By MERS own documents, they descibe

themselves variously and in a contradictory manner both "SOLELY AS NOMINEE",

simultaneously and falsely pretending to be the beneficiary of the interest in real property, yet

also as "possessing only legal title" to all mortgage tust deed referenced herein, but not as

nominee, beneficiary or trustee or any other capacity for the note, which recites the terms of the

financial relationships between the parties.

20. Defendant Does 1-25 are defendant persons and/or entities, the names of which are

not yet known to Plaintiff. Note: None of the above-named Defendants are proven to be either

the real party in interest or the actual owner of the notes; therefore, the yet-unnamed Does may

prove to be the actual owner of the note and/or mortgage trust deed.

//

//

//

//

## LITIGATION OVERVIEW

21. The subject case is rooted in the flagrant and purposeful disregard by all named Defendants of Oregon state, and United States federal, laws, including the Real Estate Settlement Procedures Act (RESPA), the Consumer Protection Act / Truth-In-Lending, the Fair Debt Collection Practices Act (FDCPA), federal Securities and Exchange Commission (SEC) laws, Oregon statutory requirements for service of notices, providing of documents, service of notices, violations of unfair or deceptive acts and practices, conversion, restraint of trade, and fraud, in a complex scheme [the Defendants' pattern of behavior constituting the required specific criteria such as constitute violations of the Racketeer Influenced and Corrupt Organizations Act (RICO)] designed intentionally to defraud the Plaintiff, and to inflict upon him catastrophic financial harm. Multiple significant state and federal laws were enacted to protect property owners and mortgage borrowers from abuses by financial institutions, and the proper invocation of these laws, as well as the commensurate remonstration against the Defendant financial institutions, and appropriate remedy and restitution to Plaintiff, is warranted, and is the foundation of necessity of filing this lawsuit.

22. Defendants have caused, and are attempting to further cause, catastrophic financial injury upon the Plaintiff, by attempting to foreclose upon the residence which Plaintiff purchased for his daughter to live, and into which Plaintiff has invested over $75,000.00 of his own personal savings, in down payment and additional improvements. Moreover, the Defendants each seek to inflict severe and traumatic emotional harm by ejectment of the residents from their home. The Defendants seek to to inequitably take this away from Plaintiff, not only absent any recompensation to him for same, but in a context of falsified documents,

missing documents, unsupported, unproven and unprovable chains of ownership of the note

and trust deed, and in flagrant, contemptuous disdain and disregard for laws of the State of

Oregon and the United States of America.

23. Defendants US Bank, and their alleged predecessor GMAC Mortgage[2], Ally Bank,

Ally Financial, Ocwen Loan Servicing have further, and specifically, aggravated this by luring

Plaintiff into believing that he had resolved a mortgage restructuring that was affordable and

manageable, then suddenly, unilaterally and without cause or provocation, retracted, reneged,

and summarily refused to continue to accept the restructured payment.

## SUMMARY STATEMENT OF FACTS

24. In 2004, I purchased the property located at 1815 E19th Avenue, in Eugene, Oregon

("Plaintiff's home").

25. I invested over $ 50,000.00 in the original cash down payment and related costs at the

time of purchase of this home (HUD-1 closing will be submitted as evidence).

26. I have, since first purchasing over a decade ago, additionally invested and made

substantial capital improvements to this property up to and including the present date, to an

extent in excess of $25,000.00.

27. This dwelling was purchased for my daughter, as her residence.

28. On December 12, 2014, a batch of papers was delivered to the property, with "Mary

Ruth Dunham, et al" hand scratched off and "occupants" instead handwritten on a summons in

a state court foreclosure case. From this, Plaintiff learned that an unknown party or group of

parties (see attached Exhibit "A"), identified as:

"U.S. Bank National Association, as trustee for Greenpoint Mortgage Funding Trust
Mortgage Pass-Through Certificates, Series 2006-AR4"

had filed a purported "complaint for foreclosure" in the Circuit Court of Oregon for Lane

County. Upon reading through the stack of papers handed at the door, these unknown parties

("U.S. Bank, as trustee for Greenpoint Mortgage Funding Trust Mortgage Pass-Through

Certificates Series 2006-AR4"), it is plainly evident that the true, actual, real-party-in-interest is

deviously concealed by this "trustee" attempting to assert some kind of claim. In fact, they have

none.

29. Moreover, even if the true owner of the note is ultimately uncovered (which it is the

intention to do in the instant case) their complaint is fatally defective, as it is based upon a

default notice (attached as exhibit hereto) that they themselves included, which is prima facie

evidence of the fatal defect, to wit:

a. In accord with their Exhibit "D" (attached), the amount due each month until October

2013 was  $543.35 per month.

b. In accord with their Exhibit "F" (attached), on March 5, 2013, Ocwen – which

represented itself as being the party authorized to collect the monthly payments

on this note, asserted:

"We have not received your mortgage payments for the month of

2/01/13 through 3/01/13"

c. This is a period of one month.

d. The mortgage payment had been made and received by Ocwen and was current for the

preceding month: 1/01/2013 through 2/01/13.

e. The "default" letter, on which US Bank was relying to attempt to foreclose (their

Exhibit "F", attached), stated, on the next lines:

| Payments | $ 1696.40 |
|---|---|
| Late charges: | 437.71 |
| Fees, costs, and other | 125.00 |
| Suspense | - 0.00 |
| Total Amount Due | $ 2259.11 |

f. This "default" letter is plainly erroneous, as only $543.35 was due for the one month

on 2/01/13 through 3/01/2013.

g. Despite repeated attempts to have this corrected, Ocwen refused to correct the amount

due, and refused to provide the documents, despite Plaintiff having requested

same by telephone and not less than three (3) times in writing (see attached

Plaintiff's exhibits).

h. From March 2013 forward, Ocwen refused to accept the monthly payments, which

continued to be $543.35 for another eight (8) months (see their Exhibit "D"), and

refused to accept less than what they declared to be the total amount "due" of

$2259.11, despite that figure being plainly erroneous.

30. The party (US Bank as Trustee") which was attempting to file some kind of

foreclosure has any relationship whatsoever to Plaintiff and is not known to Plaintiff, and has

no demonstrable or provable foundation to allege any default, much less purport to "foreclose"

or to take Plaintiffs home away from him and his family.. The party which was attempting to

sue in that Lane County Circuit is not the owner of either the note or deed of trust, nor do does

"US Bank, as Trustee" own any right to attempt to assert a foreclosure. Even their own case

caption is prima facie evidence that they are neither the real party in interest, nor the owner of the note, to wit: U.S. Bank is named as a "trustee" for Greenpoint Mortgage, which in turn is described as a "trustee" for "Greenpoint Mortgage Funding Trust Mortgage Pass-Through Certificates Series 2006-AR4", an entity that investigation reveals does not exist and is not registered in any of the fifty states of the United States. This "Funding Trust Mortgage Pass-Through" is clearly a farcical sham entity for what are hundreds of millions of dollars of mortgages it supposedly "owns", which in turn is an unknown "trust series 2006-AR4", itself an unidentified "trust" (and still not an actual owner) which is subject to Securities and Exchange Commission regulatory rules.

31. Based upon this fraudulent attempt to pursue a foreclosure, and myriad violations of state and federal law by those parties attempting foreclosure, as well as multiple related entities to those parties, Plaintiff had necessity of filing of the instant lawsuit.

<u>GMAC Mortgage, later known as Ally Bank and Ally Financial</u>

<u>UNILATERALLY RENEGED ON PAYMENT PLAN AGREEMENT</u>

32. As hereinabove set forth, Defendants Ally (Note: while it was still GMAC Mortgage at the time they reneged on the written payment plan (attached hereto as exhibit), GMAC transferred the loan by some mechanism that is not yet known, but will be revealed in discovery, and then filed bankruptcy as herein above footnoted. Thus GMAC, following their bankruptcy discharge, cannot be named as a defendant; however, the responsibility and fiscal liability for having reneged on the payment plan – each payment upon which I timely made – runs with the note, and thus is inalienably taken on by Ally. Ocwen, representing themselves as having some authority as a servicing agent of some sort, aggravated this state of affairs by luring Plaintiff into believing that he had resolved a mortgage restructuring that was affordable

and manageable, then suddenly, unilaterally and without cause or provocation, issued a

defective default letter, and summarily refused to continue to accept the restructured payment,

despite every single payment having been made on time and as agreed by Plaintiff.

33. This payment modification called for payments of $543.35 per month. Each and

every payments was made up to and including the payment at which Ocwen incorrectly

asserted a 'default' in the amount of $2259.11.

34. This payment plan was prepared and agreed with GMAC Mortgage, who represented

themselves to be, and Plaintiff was led to believe was, the owner of his mortgage.

35. There is demonstrably present an egregious inequity, with the homeowner diligently

sending all monthly payments in, yet simultaneously the "lender" or "servicer" GMAC

Mortgage and/or Ocwen abrogating and dishonoring the very payment restructure agreement

that they themselves had prepared, and to which Plaintiff agreed. The difference here is that on

one hand, we have the Plaintiff **honoring and abiding by the Agreement,** yet, on the other

hand we have the banking institution **dishonoring and failing to abide by the Agreement.**

36. This obviates the question: Where was all the money that Plaintiff sends to GMAC

and Ocwen going? To what credit was it being posted? Where did all the many thousands of

dollars in interest payments that I previously sent in go? And this leads us to the successor

question: Who is it that is actually receiving the Plaintiffs payments, who actually owns the

note and mortgage?

37. Once Ocwen / GMAC began to refuse to accept my payments, I knew not where to

turn, to have GMAC maintain the Agreement to which they had agreed. Calls to GMAC, when

a live person could even be reached, were connected to staff persons who were unable to

provide me with any information, nor get GMAC back on track with the payment plan

Agreement. In fact, the Ocwen and GMAC staff persons that could be reached by phone were remarkably unhelpful, and none appeared to have any ability or authority whatsoever to get things sorted out or make any kind of decision. Finally, one of the staff members admitted in a telephone call that "Ocwen was not actually the owner of the loan, they were just the servicing company". Does this mean that the Agreement, that Plaintiff entered into in good faith reliance on GMAC Mortgage that it was a valid and mutually binding Agreement, was not that at all, but merely a farcical attempt on Ocwen's part to extract payments under false pretenses? Yes, it now appears that this is indeed the case.

38. The Defendants, and each of them, in their complicit and mysterious web of who is the real- party-in-interest and owner of this note, abrogated the very payment modification Agreement to which they had agreed. Why did they renege on their agreement? Absent any evidence to the contrary, only one explanation is possible: that it was more profitable for them to foreclose on and evict the family that lived in this home, and to take away not only all of their life savings, but to cast them out, uproot them from their community, and sell the house off to another person, possibly for much, much less than the original amount of the loan. What social purpose is served by uprooting one family, and providing a bargain to some other party who had not put $75,000.00 of their life savings into this home?

## LENDERS FORECLOSE IN ORDER TO COLLECT ON
## U.S. TREASURY 80% REIMBURSEMENT PROGRAM

39. The purpose and intent of the Defendants U.S. Bank, Bank of America, and Citibank, and other financial institutions, some of whom may not yet even be known, is indeed nefarious and dark. This is a carefully contrived and structured financial scheme, and it harms

not only all taxpayers of the United States, but the Plaintiff most cruelly. What is little known by the public, or possibly even the judiciary, is that these lenders must complete the foreclosure in order to "quantify the loss" - e.g. establish what amount they actually collect (and supposedly "lose") for this loan asset foreclosure sale. The lenders then immediately turn to the U.S. Treasury, where they are reimbursed at 80% of the face value of the mortgage. However, in most cases, the down-the-chain "successor" of the multiple transfers has paid little, or even nothing whatsoever, for this note receivable. In 2009, in backroom over-a-weekend sessions with then-Secretary of the Treasury Timothy Geithner, massive amounts of assets were doled out to a select few mega-banks: Countrywide Mortgage went to Bank of America, Chevy Chase Bank went to Capital One, IndyMac Bank went to One West, Washington Mutual Savings Bank went to JP Morgan Chase, Wachovia Bank and World Savings went to Wells Fargo, etc. The mega-banks paid only cents on the dollar, or, in many cases, nothing whatsoever, in taking over (as compared to actually buying) what were then termed "toxic" assets.

40. Disturbingly, what is little known by the public, is that concomitant with this out-of-public-view mortgage loan asset hand-off was a deal to guarantee these mortgages at 80% of their face value to the lenders being assigned them. Herein lies the particularly devious part, about which banks do not wish the public to have knowledge: these banks are reimbursed 80% of the face value of the mortgage (again, only when they quantify the "loss"; namely complete the foreclosure and then claim "we only got 'xyz' dollars"), without examination of what they paid, or, more significantly, what they did not pay, to acquire this mortgage. Thus, they are supremely motivated to foreclose on families, and in this case, abrogate their modification agreement and eject the persons who live here.

Following is an illustrative example:

Bank Receives

Mortgage Face Amount: $300,000.00

Bank takes over "failed" institution; buys mortgage for 10% of face value: $30,000.00

Large bank forecloses on homeowner, sells house to another
    person for $150,000.00                               $150,000.00

Bank turns in claim to Dept of Treasury for 80% of
    face value of mortgage: .8 x 300,000 = $240,000.00

Less amount received from foreclosure sale:
    $240,000.00 – 150,000.00 = 90,000.00              +90,000.00

TOTAL COLLECTED BY BANK:                 **$ 240,000.00**

41. However, and this is the big however, the bank paid as little as $30,000.00, or in many cases <u>nothing whatsoever</u> (e.g. took over for the loan. Thus, even giving the mega-bank the benefit of the doubt that they paid as much as $30,000.00 for acquiring the loan, they are receiving $240,000.00, a windfall profit of **800%.** This is truly unconscionable, particularly so when it is on the crushing suffering being inflicted upon the homeowner, who loses their life savings, are evicted from their own home, disrupting families, having to change schools, putting jobs in jeopardy and disrupting the stability of communities.

Homeowner Receives

Loss of down payment and life savings

Loss of all money and work in capital improvements

Loss of all interest and principal paydown made

Ruination of credit, making securing even rental housing difficult

Displacement of self and family

Disruption of neighborhoods and community

Diminution of value of surrounding homes, due to foreclosure sell-off at low price

Emotional trauma

Catastrophic financial disaster

42. There are no mortgage bail-out programs for the homeowners; these were instead

exclusively reserved for, and handed out to, the banks. It is no surprise that each and every

banking institution that received Troubled Asset Recovery Program (TARP) funds in 2008-

2009 has repaid these in full: these have been the most profitable quarters and years in United

States banking history, for every one of the largest ten banking conglomerates. This is not due

to their making more loans and earning interest on those loans (rather the contrary, interest

earnings have been modest (at least in a relative sense to the performance return on banks

respective asset bases) in recent years, and it is not because of the monumentally profitable

bank profits such as they experienced in the period of 2002-2007, which derived from the ultra-

fast-track origination and turn-around sale of these mortgage-backed securities (bundles of

many home loans). Banks and mortgage companies pushed these loans as "products", even

calling them that, and imposed interest rates that were increased, just to make the loan

"commodity" more valuable in the secondary markets. It is not because of credit card earnings;

statistics show Americans have reduced their credit card debt in the last five years. From

whence is all of this windfall profit coming? Why do JP Morgan Chase, US Bancorp, Wells

Fargo Bank, Bank of America, Citibank, Capital One Bank, Goldman Sachs, Morgan Stanley

report record earnings and record asset balance sheets? The answer lies in their real estate loan

receivable portfolios, which are American home mortgages, many of which were acquired

when the now mega -banks took over the "failed" institutions; which read like a litany of the

ultra-aggressive perpetrators of these home loans that put homeowners such as myself at such

risk – Countrywide Mortgage, Washington Mutual Savings Bank, World Savings, Wachovia

Bank, IndyMac Bank, Home Savings of America, Bear-Stearns Mortgage, etc. These loans did

not go away – they just got acquired by the newly emergent monolithic banking institutions –

which spawned the phrase "too big to fail", and led to the creation of the TARP big-bank loans

and the U.S. Treasury 80% reimbursement programs. However, for the hundreds of thousands

of individual American homeowners that still struggle with these loans on their own homes to

this day, they have been forgotten and discarded as "too small to be of consequence".

43. It is time that this wrong be corrected, one homeowner at a time, starting with this

loan.

44. Consequently, as a matter of justice and equity, not only must the chain of title for

ownership, from day one of loan origination, until the present date, be produced, but the

amounts actually paid must be proven by documentary evidence, in each of those transactions,

for two reasons:

> a. to determine what was paid for purposes of perusal of the matter of equitable
> and fair treatment of the borrower: if some invisible entity is buying the subject
> mortgage for some fraction of its face value, then the borrower should at least
> have the same opportunity to buy back the mortgage **on their own home** for an
> equivalent amount.
>
> b. To determine if the sale or transacting of this loan and mortgage were indeed
> contractually valid events, which require that consideration (money) be paid by
> the receiving party to the transferring party in order to be a legally valid
> transaction.

LENDERS AGGRESSIVELY MARKETED HOME LOANS

THAT PLACED THE HOMEOWNERS AT UNKOWING RISK

45. These home loans were aggressively marketed in Oregon and nationwide in the 2002

to 2007 housing 'boom', with mainland lenders (particularly Greenpoint Mortgage, Bear

Stearns Mortgage, Wells Fargo, Washington Mutual, US Bank, Citibank, JP Morgan Chase,

Wachovia, Bank of America, Countrywide), many of which had no branch banking presence in the locales where they were pushing these loans, and thus no branch where a homeowner could go in, sit down and say: "I don't understand this paragraph", or "I am struggling with this loan, what can we do to work this out so it doesn't end in disaster?" swarming to entice homebuyers with easy-to-qualify loans (including "stated" income loans, and "no-income qualifiers"), all designed to originate massive volumes of loans for these lenders to package together in what are termed "mortgage-backed securities", which are nothing other than batches of home mortgages, that are sold in bulk to a succession of invisible investors, all buying them to profit on the backs of the struggling American homeowners.

46. Now, neither Greenpoint Mortgage nor GMAC Mortgage even show up as the supposed plaintiffs in their attempted state court foreclosure, except possibly in some unknown, undefined and secret relationship with "Mortgage Finance Trust Series"...what is that association? Was the real owner of the note even receiving the payments that Plaintiff was sending? **Who is the owner of this note and mortgage?** And what producible proof do they have of current ownership and a verifiable chain of ownership transfers, assignments and sales? And both Greenpoint and GMAC have eiher disappeared completely (as is the case with the former) or declared bankruptcy (as is the case with the latter)

47. Finally, the mysterious entity that attempted to file and pursue that Lane County foreclosure action against me is nothing but an unknown, vague and illusory "trust" of some sort or another – a simple reading of the cover page of their complaint exposes this ruse:

> "U.S. Bank, as trustee for Greenpoint Mortgage Funding Trust Mortgage Pass-
> Through Certificates Series 2006-AR4"

48. Never is an actual bank or real party ever identified or disclosed. It is impossible to

discern who is one's counterparty or adversary, a mandatory prerequisite to commencing the discovery and production of documents and evidence to make a threshold determination as to whether they even have standing to appear, much less to attempt a foreclosure of the Plaintiff's property.

49. Moreover, none of those "trustees" is a tangible party with whom Plaintiff can sit in a room and negotiate in good faith any resolution of the matters surrounding this mortgage, which long ago became a prerequisite before any foreclosure could commence.

50. The foregoing being the complex, confusing and confounding situation, it is the purpose of this lawsuit to:

    a. determine the real owner of the note and the mortgage, and thus the real party in interest;

    b. ascertain what monetary consideration was exchanged for each transfer of the note and/or mortgage;

    c. devise a judicially supervised reasonable and equitable resolution and modification of this home loan to prevent catastrophic financial injury, emotional harm and disruption to Plaintiff and his family;

    d. examine and evaluate in this court of law what state and federal laws have been violated by the parties and their affiliates who have attempted foreclosure;

    e. determine what fiscal remuneration for Plaintiff and remonstration against Defendants is warranted as a result of the foregoing.

## FIRST CAUSE OF ACTION

### Fraud

51. All of the elements of fraud are present. Defendants US Bank, MERS, BofA, Citi,

Ally, Ocwen and their employees, agents, attorneys, contractors and assignees, have signed

purported transfers, affidavits and other documents in the in the long history of these

documents from the moment of origination of this loan until the present date prior to attempting

to initiate foreclosure proceedings (a) which contained representations, (b) which were material

to the foreclosure proceedings, (c) some of which were made with knowledge of the falsity and

others which were made with utter disregard for whether they were true or false, (d) which

were made with the intent of misleading the courts and opposing parties into relying upon

them, and upon which the courts and the opposing parties justifiably relied.

52. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen directed their employees,

affiliate companies, attorneys, and assignees and agents in conducting mortgage foreclosure

activities in Oregon and nationwide, benefiting financially from the filing of false affidavits,

assignments and other documents.  These were (a) representations made at the direction of

Defendants (b) which were material to foreclosure proceedings, (c) which were made with

knowledge of their falsity or with utter disregard for whether they were true or false, (d) which

were made with the intent of misleading the courts and opposing parties into relying upon

them, and on which the courts and the opposing parties justifiably relied.

53. The Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen have attempted to

conduct foreclosure proceedings without producing any chain of title, much less proof of

current ownership of the Note or Deed of Trust, intentionally to avoid accountability, and to

abort and avoid defenses lawfully available to the party from whom the property is being taken

or which attempts are being made to take such property. This was done purposefully and

intentionally by these lenders, banks, mortgage servicing companies, foreclosure processing

companies and title companies to conceal defects in their chain of title and assignments.

54. The original note has never been produced, with the resultant failure to prove ownership or standing to conduct a foreclosure. Absent the note and legally cognizable chain of transfer or assignment, with consideration for such transfer or assignment proven, Defendants may have been intentionally destroyed documents due to missing assignments on the note which render it void and a legal nullity, thus having expunged and exploited key and vital evidence.

55. Other unnamed and disclosed real parties in interest may have a claim to the note and the subject property, and be the rightful beneficial owners to the note and/or the subject property, and must be identified and brought before the Court.

56. Absent the original note and mortgage trust deed, and a complete and verifiable chain of assignments, the subject note may have been destroyed or lost intentionally, and attempting to hide the beneficial owners and shield them from any assignee liability arising from the actions of the servicer who they hire and supervise.

57. Any subsequent endorsements following loan origination are demonstrably not in the records of the Lane County Recorder, excepting only the much later (almost 10 years after the origination of the subject loan; recorded after the 2009 loan agreement modification with GMAC Mortgage, during which five year time, no public recordation of any alleged 'transfer' or sale of the subject note or mortgage had ever been disclosed; Plaintiff had no way to tell who his loan was actually owned by then, and to this date still has no way to discern who might own this loan). By this tardy assignment recording, Greenpoint and MERS introduced a variety and string of purported "trustees" and "trusts", which may (or may not) have been involved in this chain of custody and sales of the note and mortgage, rights to collect payments, or any rights to

declare a default, much less to attempt to foreclose on the Plaintiff homeowner. By failing to

record the multiple alleged assignments, Defendants attempted to avoid payment of required

Oregon and Lane County statutory transfer fees and taxes and to hide true and real beneficial

interests.

## SECOND CAUSE OF ACTION

### Violations of Oregon Revised Statues §§ 86.010 et seq

58. Plaintiffs incorporate by reference as if completely rewritten herein, the facts and

allegations hereinabove set forth in this Complaint.

59. Defendants, and each of them, have engaged in a pattern and practice of unfair,

deceptive, and unconscionable acts in violation of Oregon Revised Code§§86.010 et seq by

authorizing and directing the filing of affidavits, assignments and other documents that were

false and by proceeding to foreclosure on properties in spite of the false affidavits, assignments

and other documents.

60. Defendants, and each of them, have engaged in a pattern and practice of unfair, deceptive,

and unconscionable acts in violation of Oregon Revised Code §§ 86.010 et seq by conducting

their improper and illegal mortgage foreclosure activities, by benefiting financially from the

filing of false affidavits, the filing of incorrect assignments and other documents, and by

proceeding with foreclosure proceedings in spite of the affidavits, assignments and other

documents that were false, by concealing, hiding, failing to produce, and potentially destroying

documents as may evidence ownership or the real parties in interest of the subject Notes and

Trust Deeds.

## THIRD CAUSE OF ACTION

## COMMISSION OF UNFAIR, DECEPTIVE and FRAUADULENT PRACTICES

61. Plaintiffs incorporate by reference as if completely rewritten herein, the facts and allegations hereinabove set forth in this Complaint.

62. All of the elements of fraud are present. The Defendants, and each of them, and their employees, agents, attorneys, contractors and assignees, have signed affidavits and other documents in these Oregon foreclosure proceedings (a) which contained representations, (b) which were material to the foreclosure proceedings, (c) some of which were made with knowledge of the falsity and others which were made with utter disregard for whether they were true or false, (d) which were made with the intent of misleading the courts and opposing parties into relying upon them, and upon which the courts and the opposing parties justifiably relied.

63. The Defendants directed their affiliate companies, and assignees and agents in conducting mortgage foreclosure activities in Oregon, benefiting financially from the filing of false affidavits, assignments and other documents. These were (a) representations made at the direction of Defendants (b) which were material to foreclosure proceedings, (c) which were made with knowledge of their falsity or with utter disregard for whether they were true or false, (d) which were made with the intent of misleading the courts and opposing parties into relying upon them, and on which the courts and the opposing parties justifiably relied.

64. The Defendants have previously attempted to conduct foreclosure proceedings outside Court scrutiny in a "notice and trustee's sale" process, also known as a "non-judicial foreclosure" process, intentionally to avoid accountability, and to abort and avoid defenses

lawfully available to the party from whom the property is being taken or which attempts are

being made to take such property. This is done purposefully and intentionally by lenders,

banks, mortgage servicing companies, foreclosure processing companies and title companies to

avoid having to produce proof of Note and Trust Deed ownership, and to conceal defects in

their chain of title and assignments. All of the subject cases are statutorily defective, due to

their having failed to comply with the clear specification of not merely one, but two Oregon

Statutes:

**86.060 Assignment of mortgage.** Mortgages may be assigned by an instrument in writing, executed and acknowledged with the same formality as required in deeds and mortgages of real property, and recorded in the records of mortgages of the county where the land is situated.

Thus, all attempts to transfer or assign the mortgage, as has been attempted by MERS, are **statutorily defective**, as this section clearly recites the requirement of the same formality as required in deeds and mortgages, and recorded in the records of morgages of the county where the land is situated. These notes are therefore still owned by the original mortgage beneficiary, which is the ONLY party that has authority to conduct any foreclosure proceeding.

**86.735 Foreclosure by advertisement and sale.** The trustee may foreclose a trust deed by advertisement and sale in the manner provided in ORS 86.740 to 86.755 if:

(L) The trust deed, any assignments of the trust deed by the trustee or the beneficiary and any appointment of a successor trustee are recorded in the mortgage records in the counties in which the property described in the deed is situated; and

All MERS assignments and transfers are statutorily defective.

## FOURTH CAUSE OF ACTION

### Violations of United States Securities Laws

### Section 17(a)(2) and (3) of the Securities Act of 1933

### Fraudulent Interstate Transactions

65. The subject Property title is further clouded by the Defendants US Bank, MERS,

BofA, Citi, Ally, and Ocwen fraudulent violations of Section 17(a)(2) of the Securities Act of

1933. While Defendants might contend that Plaintiff herein is not an investor in such securities,

The United States Supreme Court specifically observed that:

"nothing on the face of the statute requires a plaintiff to reach investor
status in order to avail himself of section 17(a) remedies."

See United States v. Naftalin, **579 F.2d** 444, 445 (8th Cir. **1978);** notes 14 **&** 18 supra;

441 **U.S. ;** Id. at 772; see note 7 supra

66. While that ruling was in a context of Supreme Court case involving securities

brokers, it has applicability herein by way of Section 17(a)(2) containing no recital that anti-

fraud remedies are available to only "investors" in the securities in question.

67. Concealed ownership via the securitized offerings with which the Plaintiff's

mortgage was clearly involved – this is obviated by way of the "US Bank as Trustee for

Greenpoint Mortgage Trust Series" which is itself an aggregation of individual home loans into

a "package" that was sold as a securitized financial investments[20], automatically invoking

Securities and Exchange Commission regulatory applicability and jurisdiction. clandestine

transacting and transferring outside of the Lane County public recorder's office, invokes the

fraud provisions of Section 17(a)(2) (3) of the Securities Act of 1933.

68. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen knowingly violated

Section 17(a)(2) of the Securities Act of 1933, specifically:

FRAUDULENT INTERSTATE TRANSACTIONS
SEC. 17. (a) It shall be unlawful for any person in the offer or sale of any securities
(including security-based swaps) or any security- based swap agreement (as defined in
section 3(a)(78) of the Securities Exchange Act) by the use of any means or instruments
of transportation or communication in interstate commerce or by use
of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material

fact or any omission to state a material fact necessary in order to make the statements

made Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen:

    **a**) made untrue statements of material facts, and

    **b**) omitted to disclose that the note and mortgage trust deed had purportedly been

transferred to another party or buyer, and

    **c**) obtained money by means of these untrue statements and omissions of material facts,

inasmuch as it is a reasonable presumption that the recipient of money transacted this via

Greenpoint Mortgage Funding Trust Mortgage Pass-Through Certificates Series 2006-AR4,

which is a security as defined under the United States Security Act of 1933, as follows:

### DEFINITIONS

SEC. 2. (a) DEFINITIONS.—When used in this title, unless the context otherwise
requires—

> (1) The term "security" means any note...evidence of indebtedness, certificate of
> interest or participation in any profit-sharing agreement, collateral-trust
> certificate...or group or index of securities (including any interest therein or
> based on the value thereof)...or, in general, any interest or instrument commonly
> known as a "security", or any certificate of interest or participation in, receipt
> for, guarantee of, or warrant or right to subscribe to or purchase, any of the
> foregoing.

69. The ultimate owner or owners of said securities are not yet known to Plaintiff, which

ultimate owners may later become added within the group of currently unknown Doe

defendants.

## FIFTH CAUSE OF ACTION

### Breach of Trustee Fiduciary Duty

70. As against US Bank, who asserts that they are trustees in the case they had filed in the Lane County Court: The trustee's roles in the subject mortgage transactions appear to have been inadequately examined, particularly with multiple secret hand-offs and concealed attempts at transfers of ownerships of interests in real property – specifically trust deed mortgages - and the responsibility of such trustees to conduct their fiduciary duty to the client party by whom they have been compensated: by the receipt of interest payments received from the property buyer / borrower, who is the Plaintiff herein.

71. In the instant case, US Bank acted in a trustee capacity, purportedly regarding financial instruments in which Plaintiff has a clear interest. The only person known to have paid, and thus hired, in the subject loan transaction was the Plaintiff, deriving from mortgage origination points paid, loan fees, and subsequent interest payments made of many thousands of dollars. These trustees thus owe a fiduciary duty to Plaintiff, having accepted compensation engagement as an alleged trustee. These Defendants also have an inalienable fiduciary responsibility to protect the interests of their client, which they appear to believe they can blithely abrogate by opting out of their responsibilities as trustee, when they substitute other successor trustees in the course of events.

72. It is possible that US Bank may have a dual, and conflicted interest, role in potentially attempting to also be trustee for the various other entities, including MERS, Bank of America, GMAC Mortgage and Ally.

## SIXTH CAUSE OF ACTION

### Fair Debt Collection Practices Act

73. Violation of the Federal Fair Debt Collection Practices Act ("FDCPA"). The acts and omissions of Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen utilized means which were false, deceptive and/or misleading. In attempting the collection of this debt, Defendants did and do utilize unfair and/or unconscionable means of collections against Plaintiff, which have caused the harm to be caused to the Plaintiff herein, who now owns property which has clouded and defective title.

## SEVENTH CAUSE OF ACTION

### Violation of Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. Sec. 1961-1968

### Double Damages Apply

74. The frequency and persistence of the behaviors of Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen is so nationally widespread, repeat and continuous that it cannot be characterized other than as profligate, insidious, and pervasive, and it can only be characterized as a pattern of behavior so institutionalized and pervasive that it conforms to the definition of racketeering, as defined under the Racketeer Influenced and Corrupt Organizations Act (RICO) prescriptions.

75. Each of the Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen, and their owners, officers, directors and agents have committed not less than two federal and/or state crimes. The requisite number per 18 U.S.C Sec 1961 is thus met:

**18 U.S.C. § 1957. Engaging in monetary transactions in property derived from**

**specified unlawful activity sets forth:**

> (a) Whoever, in any of the circumstances set forth in subsection (d),
> knowingly engages or attempts to engage in a monetary transaction in
> criminally derived property of a value greater than $10,000 and is derived
> from specified unlawful activity

(f) As used in this section—

> (1) the term "monetary transaction" means the deposit, withdrawal,
> transfer,  or exchange, in or affecting interstate or foreign commerce, of
> funds or a monetary instrument (as defined in section 1956(c)(5) of this
> title) by, through, or to a financial institution (as defined in section 1956 of
> this title), including any transaction that would be a financial transaction
> under section 1956(c)(4)(B) of this title,

> (2) the term "criminally derived property" means any property constituting,
> or derived from, proceeds obtained from a criminal offense; and

> (3) the terms "specified unlawful activity" and "proceeds" shall have
> the meaning given those terms in section 1956 of this title.

76. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen have contrived, conspired and colluded to create and an illegal scheme of recordation, commonplace utilization of falsified documents and intentionally obstructed justice in hiding documents as would evidence either ownership or divulging financial accounting disclosure in profiteer activities.  So insidious are these practices that they can only be deterred via the imposition of an order of RICO violations, and the concurrent double damages clause as set forth therein.

## EIGHTH CAUSE OF ACTION

### Conversion

### Conversion by US Bank, MERS, BofA, Citi, Ally, and Ocwen

77. The nature of the noncompliance is Defendants attempt to convert the property, and all of the down-payment, costs of property acquisition and capital improvement expenses invested by Plaintiff to the Defendants own cash, by the Defendants' attempt to foreclose on Plaintiff's Home.

78. The noncompliance is intentional; as demonstrably evidenced in thousands of similar cases nationwide, Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen continue unrelentingly to attempt to conduct their foreclosures. They cannot feign ignorance, and thus their practice is clearly intentional.

## NINTH CAUSE OF ACTION

### Restraint of Trade

79. Plaintiff has been harmed by all Defendants in now being restricted, as a result of the actions of Defendants from being able to refinance or, at any later date, sell the Property, as Plaintiff now has constructive notice that title to the property is defective, due to the defective mortgage currently of record. Should Plaintiff fail to disclose, in any potential sale or refinance transaction, that he has constructive notice of same, then Plaintiff would become complicit in the illegal scheme perpetrated by Defendants, and incur financially substantial liability, and possibly even criminal fraud liability. Consequently, this constitutes both:

a) financial harm which grows worse with each passing month while Plaintiff cannot replace the existing loan put in place at the time of purchase, and

b) a restraint on Plaintiff's ability to transact or later sell the Property, as no sale could

occur without Plaintiff intentionally concealing the defect in title (which Plaintiff will not do), thus imposing a concealed liability to any subsequent purchaser, or accepting a diminution of value as compensation for a subsequent purchase to purchase the Property with its appurtenant title defect.

80. There is nothing which prevents a presently unknown entity from claiming to be the actual owner of the Note and/or Deed of Trust, which would further impair the title to the Property, and would cause Plaintiff to have to expend time and costs to defend against loss of the Property into which he has invested substantially.

Contravention of Reasonable Public Policy

81. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen have engaged in practices which constitute a contravention of reasonable public policy, by dislocating one resident for another, often entire families, causing massive life disruption, loss of jobs, forced moves to different schools, economic hardships, impairment of credit, emotional distress, and even breakup of families. These Defendants attempt to foreclose, throw the owner out on the street, then sell or rent to someone else for a reduced price due to the diminished economic state of the market. This contravenes reasonable public policy, in dislocating American persons and families merely to serve the financial agenda - and monumental monetary gain - of the banks, mortgage companies, and the law firms they engage to pursue these foreclosures. As a consequence of this, it is incumbent upon this Court to see to the cessation of the rampant proliferation of the same.

## TENTH CAUSE OF ACTION

### Obstruction of Justice

82. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen have, both individually, and as a cooperative undertaking amongst various alliances amongst themselves, conspired to obstruct the carriage of justice in the within matters and transaction. The combination of intentional violations of law, secret transfers not recorded in the public record, hidden ownership interests (including securities ownership and fractional ownerships via the Chase Greenpoint Mortgage Finance Trust), using falsified documents, relying on "documents" which do not even appear to exist (i.e. the purported transfer of ownership of the note and mortgage trust deed from Greenpoint and GMAC Mortgage), stubborn refusal to produce documents requested, and attempts at avoidance of scrutiny by courts by way of quickly filing motions to dismiss and for summary judgment, together comprise an intentional attempt by all Defendants to obstruct justice.  While Plaintiff does not pretend (and obviously cannot) to assert a claim of criminal obstruction of justice[1],

83. 18 USC Chapter 73, Sections 1505 (Obstruction of Proceedings before departments, agencies and committees), 1517 (Obstructing examination of financial institution)  and 1520 (Destruction of corporate audit records).

## ELEVENTH CAUSE OF ACTION

### Wrongful Foreclosure – Quiet Title

84. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen have engaged in a pattern and practice of unfair, deceptive, and unconscionable acts in violation of Oregon Revised Code

---

1   Although each and every one of the within civil defendants is and has been the subject of many criminal investigations by state and federal Attorneys General, and Plaintiff herein has requested specific investigation by the Oregon Department of Justice into the transactions which are the subject matter of this civil complaint.

by authorizing and directing the filing of affidavits, assignments and other documents that were false and by proceeding to foreclosure on properties in spite of the false affidavits, assignments and other documents.

85. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen have engaged in a pattern and practice of unfair, deceptive, and unconscionable acts in violation of Hawai'i law, by conducting their improper and illegal mortgage foreclosure activities, and by benefiting financially from the filing and failing to produce assignments and other documents, and by proceeding with foreclosure proceedings in spite of the affidavits, assignments and other documents that were false, by concealing, hiding, failing to produce, and potentially destroying documents as may evidence ownership or the real parties in interest of the subject note and mortgage deed of trust.

86. Notes are pledged, sold, bifurcated, and traded in various derivative transactions. Only possession of the actual original note can prove the actual owner and holder in due course. It is not yet known if the subject mortgage was ever registered in the MERS system. As recently upheld by the Washington Supreme Court in Bain v. Metropolitan Mortgage Group, it was definitively ruled that MERS was not a lawful beneficiary and did not have the right to appoint trustees. The decision states:

"A plain reading of the statute leads us to conclude that only the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to proceed with a foreclosure on real property. Simply put, if MERS does not hold the note, it is not a lawful beneficiary".

87. A "nominee" such as MERS has no legal authority to foreclose upon the Plaintiff. MERS also maintains a defective claim to simultaneous status as "nominee" and as "holding

only legal title", two clearly contradictory roles and definitions.

MERS pretends to be a "beneficiary", but is not; they have never had any financial interest whatsoever in the mortgage trust deed, and thus cannot gain any right to claim they were ever an actual beneficiary.

88. Lenders are beneficiaries under the statute if they are the ones "designated in the trust deed as the person[s] for whose benefit [the] trust deed is given. MERS never was a lender; a lender is defined as "one who loans money".

89. MERS mere self-recital that they are a "beneficiary" is abjectly devoid of any meaning. Were that to be taken without delving into the legally cognizable definition of a beneficiary, then any corporation, or a falsely made-up name, could be simply inserted into a deed of trust. No court would endorse such a sham, or could recognize any purported later assignment by corporation, or falsely made-up fictitious entity. And no court informed of the above can endorse the sham of pretending that MERS is a legal beneficiary, simply because "MERS" says they are. The trust deed language was written by the Defendant MERS and their member banks and to suit their wholly owned and controlled secretive "recordation" scheme. "MERS", and their self-proclamations, do not create something which is not.

## TWELFTH CAUSE OF ACTION

### Unfair Practices - Gross Financial Inequity

90. Plaintiff is suffering from the injustice of a gross financial inequity, as lender is protected by three governmental guarantees:

       i. FDIC 80% lender guarantee based on original note balance

ii. Mortgage Insurance policies risk-of-loss insurance not available to

borrowers (Note: over 70% of all mortgage insurance policies were

underwritten, issued and held by AIG, which was the largest single

recipient of TARP (Troubled Asset Recovery Program) government-

distributed funds.

iii. TARP bailout funds distributed to Bank of America, Citibank and US

Bank,

while the borrowers have no similar protections whatsoever, thus an egregiously inequitable

situation is extant.

90. Inequity due to gross imbalance of monumentally vast financial and legal resources

at the disposal of banks, compared to the financially disadvantaged consumer borrowers, as a

matter of "equity" in the courts. Plaintiff herein does not have financial resources to even hire a

single attorney, while the Defendants have, in any comparative measure, effectively unlimited

financial and legal resources at their disposal, and bring them to bear against the disadvantaged

Plaintiff, as Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen work feverishly to

avoid a case precedent that is expositive of their abuses in foreclosures, fraudulent activities,

and flagrant violations of Oregon and federal laws,  their profiteering at the expense of total

and catastrophic losses by property owners, who are at risk of the loss of ALL of their down

payment savings and monies invested in capital improvements, while the banks are protected

by insurances and taxpayers monies to which the homeowners have no access.

91. When the real estate markets collapsed in Oregon in 2008-09, and have not yet

recovered, the individual homeowner Plaintiff was at a monumentally disadvantageous and

inferior position to each of the extreme-wealth Defendants. This alone is sufficient cause to weigh the inequities and relative respective financial and emotional injury inflicted upon the Plaintiff vs. the "harm" suffered by Defendants (as above set forth, the 'harm' they shrilly cried of having to absorb "toxic" assets of portfolios of home loans is abjectly farcical; the Defendant banks US Bank, MERS, BofA, Citi, Ally, and Ocwen each have monumentally profited on the back of both U.S. Taxpayers and foreclosed homeowners. But the underlying truth is even more insidious: this situation was **caused** by the insatiable greed of the mega-banks. I did not design, create, and procure these no-income qualifier and 'stated-income' loans into the marketplace, these lenders did; the lenders did so for a single reason: their own stratospheric profit, buying and selling batches of mortgage portfolios in the secondary market. Investigations by state attorneys general, and by the United States Department of Justice, the new Financial Institutions Oversight Committee and by the Securities and Exchange Commission have slowly and incrementally revealed the rampant and pervasive extent to which the banking industry was instrumentally responsible for having made real estate purchase credit available at what appeared to be increasingly attractive terms to hopeful homebuyers, which caused property prices to explode; buyers worried they would never be able to afford to own a home for their family; so, they gathered all of their savings, in order to buy a home before they would be forever priced out of the market. The banks, with teams of highly educated and specialized economists, propagated and fueled - by providing these so-called "easy-qualifier" loans - this overheated market, while furiously selling off and trading these mortgage-backed securities portfolios, all based on what is, from any competent economists perspective, an abjectly unsustainable inflation of prices: income levels simply do not support hat level of housing costs. But the home buyers – and I did not know this – all they knew was that they seemed to

have one last chance to buy a home for their families before prices raced forever out of reach.

92. Now, after the windfall profits reaped by, US Bank, Citibank and Bank of America, they seek to go again return to the cache of golden coins, take away the Plaintiff's property, turn around and sell the house to someone else, and then collect at the winnings window of the U.S. Treasury. It is incumbent upon this Court to prevent this egregious inequity from occurring.

### THIRTEENTHTH CAUSE OF ACTION

#### Obstruction of Justice – RESPA Violations

93. "**Servicers must respond with the information requested by the borrower" 12 U.S.C. Sec 2605(e)(2)(C)(i)".** Despite Plaintiff's two separate submissions under RESPA Qualified Written Requests (QWR's), Ocwen and GMAC (aka Ally) failed to produce even a single page of the documents that were actually requested (evidences of legal transfer, proof of custodianship of original documents, current location of original documents, chain of custody of original documents, certified copies of blue ink signed original notes and trust deeds, evidence of amounts paid at each alleged transfer). Defendants steadfastly and persistently refused to supply any documents which would connect them to any present day claim of ownership.

94. This intentional and purposeful failure to produce documents  constitutes no less than a clear violation of Federal law, under RESPA, 12 USC Section 2605, and an obstruction of justice by Defendants.

### FOURTEENTH CAUSE OF ACTION

#### Unfair and Bad Faith Dealing

95. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen have engaged in practices which constitute Unfair and Bad Faith Dealing, with a secret hidden agenda of making it

appear to the public that they are negotiating mortgage modifications in earnest, when they are actually completing only a select few that "fit" the federal Homeowner Retention Plan, and even deceiving their own staff members (who are fed the "company line" and perhaps genuinely believe they are actually trying to get workouts completed), with the real agenda being to take the property, thus be able to declare and quantify the "loss", and recover money (that is, taxpayer money) based on the face value of the original note, irrespective of what they actually paid for it. This, of course, is why the lenders fiercely persist in failing to turn over evidentiary documents, it is why they try to further hide and conceal the ownership transfers, and why the Defendants pretend they don't have them, produce only copies of the note and Trust Deed, but not the ownership, transfer or amount paid documents. Because of this unfair and bad faith dealing, the Plaintiff is at risk of suffering damages including the loss of their savings and down payment funds exceeding $115,000.00, capital improvements made over the course of nearly a decade, and tens of thousands of dollars in interest payments made.

## FIFTEENTH CAUSE OF ACTION

## Violation of the Consumer Credit Protection Act

## Truth In Lending

96. Violation of the Consumer Credit Protection Act 15 U.S.C. Section 1640 (Truth in Lending). Jurisdiction is applicable, as action may be brought in any US District Court per 15 USC Sec 1640(e). Additionally, per 15 USC Sec 1640 (a)(2)(A)(iv), in the cases of an individual action relating to a credit transaction not under an open-end credit plan that is secured by real property; thus applicability is relevant.

97. Not only were the original loan documents setting up a situation for the Plaintiff that was not explained, nor was Plaintiff informed by Greenpoint that his loan might (actually

would, as it was clearly the premeditated intention of Greenpoint to sell this loan off to another 'investor' or to other unknown parties right from the origination of the loan) be sold off to an unknown, unidentified and unreachable owner, with whom Plaintiff could establish no bilateral dialogue, nor with whom Plaintiff could not meet and converse about loan modification discussions when the real estate marketplace collapsed, rendering Plaintiff at an unbelievably inferior disadvantage to those who owned – and those who claimed to own, his home loan.

## SIXTEENTH CAUSE OF ACTION

### Violation of Federal Debt Collection Practices Act – Section 1692

98. 15 USC, Chapter 41, § 1692j. Furnishing certain deceptive forms (a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

99. The FDCPA, Section 1692 reads as though the lawmakers who passed this law contemplate, or have observed, and thus precipitated necessity of legislative enactments and protections, creditor violations exactly as have been done by JPMC, US Bank, Wells Fargo and Chase.

**a.** These Defendants and their predecessors, on whose documents they rely to attempt to foreclose, designed, compiled and furnished the forms.

**b.** These Defendants and their predecessors, knew that their forms would create a false belief that a person other than the creditor ("creditor" is defined as one who extends credit; the party or lender who actually provides the money) is participating in the attempt to collect a debt, when in fact such person is not participating.

c. These Defendants went to great lengths to create an impression that they were the "beneficiary", iterating such throughout the myriad 'trustees' and unknown 'trust entities', when, in fact, none of these entities either the creditor, or a beneficiary. A beneficiary is "person for whose benefit the trust deed is given". MERS also does not fit this definition, as the person [party] for whose benefit the trust deed was given was the lender, and the lender alone, who provided the item of contractual benefit and consideration [money] to the borrower.

100. This is a clear and direct violation of federal law, and the Defendants violation of same has caused catastrophic financial harm to the Plaintiff.

101. The FDCPA, Section 1692 (b) recites: "Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 1692k of this title for failure to comply with a provision of this subchapter".

102. Violation of 15 USC, Chapter 41, Sec 1692K, the Debt Collection Practices Act. (DCPA.),(b) Factors considered by court:
"In determining the amount of liability in any action under subsection (a) of this section, the court shall consider, among other relevant factors—

(1) in any individual action under subsection (a)(2)(A) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional".

## SEVENTEENTH CAUSE OF ACTION

### Unjust Enrichment - Windfall Profits

103. Judicial Notice is requested to recognize that none of the Defendant banks that have been allegedly "burdened". "Burdened" is a misnomer; these were arrangements whereby certain banks were given TARP funds and supported by government (taxpayer funded)

financial guarantees with taking over failed institutions, i.e. Bank of America taking over

Countrywide; Wells Fargo taking over Wachovia & World Savings, One West taking over

IndyMac, JP Morgan Chase taking over Washington Mutual, Capital One taking over Chevy

Chase...this was little other than a back-room card game, doling out the monumentally valuable

(made more so by their loans being guaranteed by the federal government and taxpayers in the

process) assets, which was completed secretly outside public inclusion or scrutiny. It is no

happenstance that one does not hear of banks complaining that they have been forced to take

over so-called "toxic assets"; this is because they are covertly monumentally profiting, as

described hereinabove. This has set the stage for windfall profits to be reaped by the banks, to

the gross prejudice and harm of the Plaintiffs. This is why we observe JP Morgan Chase, US

Bank, Wells Fargo and the other giant banks reporting, in the preceding five fiscal quarters, the

largest profits in their histories...it is not due to new lending activity (which is now largely

FannieMae and Freddie Mac standardized loans) or due to efficiencies and reductions in bank

expenses, it is because they purchased the batches of home loans, or even entire former

institutional mortgage lenders, for a fraction of their face value.

Example: Bank of America acquired all assets and receivables of Countrywide Mortgage

for less than one cent on the dollar, in a secret, out-of-public-scrutiny, weekend meeting; they

are happy to foreclose on a $100,000 loan they paid $1,000 for, make it appear that they are

"suffering" because they are "only" getting, say, 50% of the amount due, which would equate

to $50,000 from the foreclosure sale, then turning the claimed "loss" which is now quantified

(which only occurs when they complete the foreclosure, and thus quantify the "loss") in for

"loss coverage" to FDIC, which pays them the difference between the amount received and the

80% of the **face value of the note**, which equals $80,000; thus, they get $30,000 from FDIC,

plus the $50,000 from the roughshod foreclosure; therefore, they are receiving $80,000.00 for a note for which they paid $1,000. A more profitable scheme is scarcely able to be conceived. This is a 7900% return on investment, a monumental windfall.

104. It is not only possible, but **reasonably certain**, that exactly the same circumstance has occurred in the subject JPMC Mortgage and subsequent "transfers", and assignments. The only way this can ever be discovered by the Plaintiff, and by this Court, is to require:

> i.) Production of all documents of the chain of ownership passing of both the note and mortgage trust deed, and
>
> ii.) Production of all documents, evidence, checks, wire transfers, exchange of money or other consideration which was involved at each fulcrum point of each transfer.

105. This may take a bit of investigative work, perhaps be a bit burdensome (but, given the amount of money involved, and the pervasive practice by the Defendants herein, it does not meet a standard of "unduly burdensome" to attempt to resist production); however, it is essential and mandatory to determine what the extents and amounts of Unjust Enrichment and Windfall Profits have been for the Defendants herein.

106. The Plaintiff has no such protections, and no similar access to windfall profits. Instead, the Plaintiff has suffered, and continue to suffer damages including the loss of his savings and down payment funds, should any foreclosure be allowed to conclude.

107. **This is not right. This is not just. This is not equitable, by any stretch of opinion. It is a matter of justice and equity that must be administered by this Court.**

## EIGHTEENTH CAUSE OF ACTION

### Contract of Adhesion

108. In each and every instance, the loan documents which were presented to the Plaintiff were entirely of the lenders own devisement. If a borrower wished to purchase a property, they had no choice but to sign the documents placed in front of them by the lenders. The Plaintiff was afforded no opportunity to propose amendments, or adjust language to create balanced lender-borrower contractual relationships. These are true contracts of adhesion: sign it or get out of the office. Worse still, these documents are lengthy tomes, which contain language that even many persons within the industry cannot decipher or interpret, such as in reference their recitals of simultaneous status as "nominee" and as "holding only legal title", but then later claiming to be the "beneficiary", with unbridled self-appointed license to assign and transfer with wanton disregard for state law. So profligate is the "industry standard" of presenting pre-printed contracts with no chance for the other party to suggest language and content for their own protection, that lenders have adopted the undeniably arrogant position that their loan documents are irrefutably appropriate. Moreover, lenders, the Defendants herein, adopt this presumptive posture for the sake of their own "efficiency" and "uniformity", such that they retain absolute control and the upper hand in the event of any later loan disagreement or "default", with lenders having effectively sole position to unilaterally assert (merely by their own proclamation, with no supporting evidence or documentation) that a default is purported to have occurred, and thus abjectly unfair and imbalanced relationship between the parties.

109. These banks were intent on maximizing their loan production volumes by removing any requirement of reasonable ascertaining of borrower income capacity to make loan

payments, and then worsened the situation by creating and participating in a "secondary

market", often called "mortgage securitization", where batches of home loans were packaged

into "portfolios", and sold to other investors and institutions; moreover, and worse still, these

lenders were motivated to charge the *highest* rate possible to the borrowers, as the higher rate

notes were worth more in these secondary markets, in *many cases even more than the face*

*amount of the loan.*

110. The Defendants cannot bifurcate and distance themselves from the original

circumstances and actions of the original lender by their insertion of a multiplicity of 'trustees'

and unknown 'trust entities', as it is on these same original loan documents on which they

purport to be able to claim any interest in the real property, and thus attempt to conduct any

foreclosure sale, provided, of course, that they can even document and prove a legally valid

chain of ownership in accord with Oregon Revised Statutes. The Defendants cannot selectively

pluck out the portions which describe security interests or foreclosure, and yet not select the

terms and situation under which the loans were propounded upon the borrowers.

111. The subject loan in the instant case was a "no-income qualifier"; that is, Greenpoint

Mortgage, by loan guidelines which were entirely of their own devisement, and about which

loan underwriting criteria the borrowers had no say or input whatsoever, approved the

borrowers while *intentionally* ignoring analysis of the borrower's ability to pay the proposed

payments.

112. These lenders, the Defendants herein, did this for one reason: **profiteering**, to the

extreme detriment and harm of borrowers and the Plaintiffs.

113. This alone is sufficient cause for these loans to be voided completely. When viewed

in the context of all of the other causes of action, there is more than ample grounds for these

loans to be declared unenforceable in toto.

ARGUMENT

114. This matter involves a pervasive disregard for state and federal laws and regulatory requirements, and an attempt to improperly foreclose on a family home by a complex scheme of illusive and vague factions of financial entities and their myriad agents and trustees.

115. The very first step in peeling back the layers of supposed trustees, hidden alleged transfers of the note and/or the trust deed, the consideration tendered [or, conversely, not tendered] in any of these alleged transfers, the attempts to avoid and subvert discovery and production of documents that MUST be produced and made available for review by this Court, the Plaintiffs and to the public record, and the repeated attempts by these Defendants in cases nationwide, as well as the instant matter, to attempt to conduct foreclosure not only lacking proper standing to do so, but having violated myriad state and federal laws along the way, must commence with a full and complete discovery process.

116. The Plaintiff has a well-founded and reasonable cause to believe Defendants, together and collectively, have committed multiple and complex frauds, propounded deceptive and unconscionable acts and practices upon Plaintiff, causing egregious harm and financial losses to Plaintiff, for the sole purpose of the Defendants own unjust enrichment. The Defendants have used and abused foreclosure processes, purposefully attempting to take the property belonging to Plaintiff, cause Plaintiff catastrophic financial loss of all his savings, down-payment monies, and capital improvements made to the subject property, and to eject Plaintiff and his family from their Home.

117. All Defendants have stubbornly resisted producing even a single document page which might prove [or, conversely, disprove] that they even have any ownership interest in the

subject notes or trust deeds, instead relying solely on their own undocumented presumptions, proclamations and assertions, as though that should somehow suffice, simply because they are some multi-billion dollar financial institution, or "too big to fail" in recently used jargon. All Defendants herein have expended great time effort and production of writings, expended untold millions of dollars on their attorneys, all attempting to prevent homeowners from obtaining the simple, straightforward, honest disclosure of such ownership documents, claiming that such documents are somehow "privileged", "proprietary" or "unduly burdensome" to produce. If they truly have any documents, it cannot be any but the simplest matter to produce the same to this Court. No court should allow these lenders and their complicit associates to proceed until they have provided irrefutable evidence to the Court that they have a valid current claim of ownership.

118. The Defendants have operated in collusion amongst themselves, creating a complex fabric of deception, solely to serve their own profitability purposes, all to the extreme prejudice of Plaintiff. The Defendants have used falsified documents, and obstructed and caused intentional miscarriages of justice by failing to produce documents as would evidence their ownership, and lack thereof, of the note or mortgage trust deed. Defendants US Bank, MERS, BofA, Citi, Ally, and Ocwen, in their attempt to foreclose, have acted illegally, in blatant and intentional violations of clear state statutes requiring the recordation of any assignment of any interest in real property, which a mortgage irrefutably is.– *which has never been recorded* in the records of the state. Recordation and registration is required by law, and the trust deed, and any of the transfers secretly conducted by any sub-assignment thereunder, including any purported transfers to other Defendants, are statutorily unenforceable.

119. The Defendants have further intentionally and purposefully complicated, delayed

and prevented – indeed, they even have reneged on the agreement of October 2009 - any attempts by the Plaintiff to reasonably modify the loans to reflect financial and real estate markets and conditions of the economy. The Defendants, and their predecessors and assignors (upon whose same documents the Defendants rely to attempt to foreclose) have intentionally enticed and lured borrowers into accepting loans which bear high rates of interest, based on indexes unknown and far beyond the control of any individual borrower and wildly fluctuating interest rates, all for the singular purpose of selling these loans into "secondary" markets, often at prices even higher than the face amount of the note, which practice constitutes profiteering and unjust enrichment to the extreme harm and detriment of the Plaintiffs.

120. The Defendants have attempted to wrest all of the Plaintiff's down payment funds and capital improvement monies away from Plaintiffs without just compensation, attempted to unlawfully eject legitimate residents of the homes which are the collateral security for the note instruments at question, used falsified, incomplete and inadequate documents to attempt to improperly take the Plaintiff's home. The Defendants have sought to inequitably and unjustly enrich themselves at the expense of the taxpayers of the United States of America by foreclosing on properties, then turning and collecting windfall profits via U.S. Treasury programs which reimburse lenders based upon the original face value of real estate loans. The Plaintiff herein has been United States citizen since birth, and a taxpayer for many years, and thus has standing not only as an individual, but as a member of a class: U.S. Taxpayers.

121. The Defendants have violated the laws of the State of Oregon and of the United States of America.

122. The above actions of Defendants now aggregate to a clear conspiring and collusion by the Defendants to take money and properties from Oregon and nationwide homeowners by

illegal foreclosure practices. The Defendants then attempt to convert this to cash for themselves, thus becoming guilty of conversion, to the detriment of Plaintiffs and for Defendants own enrichment.

123. The Defendants have violated federal laws, including the Fair Debt Collections Practices Act, the Consumer Credit Protection Act, the Racketeer Influenced and Corrupt Organization Act, and are guilty of obstruction of justice.

124. The inequity and egregious misconduct on the part of the Defendants must be arrested and rectified, plus proper recompense paid to Plaintiff, including his loss of over $75,000.00 of savings and cash investment in his property.

## CONCLUSION

125. The extent of the gross inequities between the individual Plaintiff homeowner and the mammoth banking entities in plainly evident. The Defendants blatant and arrogant violations of the laws of both the State of Oregon and the United States of America are readily apparent, pervasive, and so recurrent as to constitute a chronic pattern of behaviors. The financial, emotional and family harm that these banks and their complicit cohorts are insidious and egregious.

126. It is time, long past time, that this be viewed in the entirety of its context, for both myself, as well as all homeowners nationwide that have been placed in this severely disadvantaged situation by these banks.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. ISSUE a preliminary and permanent injunction enjoining all Defendants (doing business under any name, their agents, partners, servants, attorneys, representatives,

subsidiaries, parent companies, alleged owner or alleged real-party-in-interest of the Note

and/or Mortgage, employees, successors and assigns and all persons acting in concert and

participation with them, directly or indirectly, through any corporate device, partnership or

association) from proceeding with foreclosure on the property of Plaintiff.

B. ORDER the production of all documents which may evidence ownership of the Note

and Deed of Trust, including all chain of such transfers of ownership.

C. ORDER the productions by Defendants of the actual blue-ink original Note and

Mortgage for the subject loan.

D. ORDER the production of all documents, payments, wire transfers of funds, checks,

and all other which evidence the actual amount(s) paid at each and every transacting of the

Note and Deed of Trust for the subject loan.

E. ORDER the production of all documents which document each of the multiple layers

of "trust and trustee relationships between the various defendants.

F. DECLARE all Defendants in violation of the Federal Fair Debt Collection Practices

Act, and award Plaintiff the sum of $1000.00 from each Defendant for same.

G. DECLARE all Defendants in violation of the Consumer Credit Protection Act, and

award Plaintiff the sum of $1000.00 from each Defendant for same..

H. DECLARE all Defendants in violation of the Racketeer Influenced and Corrupt

Organizations Act, and award Plaintiff the sum of $450,000.00 (treble damages) from the

Defendants jointly and severally for same.

I. DECLARE all Defendants in violation of Section 17(a)(2) and (3) of the Securities

Act of 1933, and award Plaintiff the sum of $1000.00 from each Defendant for same.

J. DECLARE all Defendants in violation the Real Estate Settlement Procedures Act, and

award Plaintiff the sum of $1000.00 from each Defendant for same..

K. DECLARE quiet title and expungement of the mortgage lien recorded against Plaintiff's property, in the absence of production of the original Note and Mortgage and a valid legal chain of ownership of same.

L. DECLARE all Defendants guilty and financially responsible to Plaintiff for fraud, common law fraud, restraint of trade, conversion, unfair business practices, bad faith dealing, and in violation of their trustee fiduciary duty,

M. ORDER Defendants to pay additional actual and non-economic damages deriving from the conduct of the Defendants.

N. ORDER Defendants which have common business associations or are partnered as loan servicer, alleged note owner, "trustee" holding interests for another party, "mortgage-backed securities portfolio", or investment company, to be jointly and severally liable for all monetary amounts awarded herein;

O. ORDER Defendants to pay Plaintiff its attorney fees (if any, should Plaintiffs hire attorneys in the conduct of this case) and costs.

P. GRANT such other relief as the court deems to be just, equitable and appropriate.

Dated: December 26, 2014

Respectfully Submitted,

_/Charles Barker III/_

Charles Barker III, PLAINTIFF

## SUPPLEMENTAL POINTS AND AUTHORITIES

**1.** U.S. Bank N.A. v. Ibanez and Wells Fargo Bank NA v. LaRace et al, Supreme Judicial Court of Massachusetts, No. SJC-10694.

In a decision that may affect foreclosures nationwide, Massachusetts' highest court voided the seizure of two homes by Wells Fargo & Co and US Bancorp after the banks failed to show they held the mortgages at the time they foreclosed.

The Supreme Judicial Court of Massachusetts on Friday issued its decision, which upheld a lower court ruling.

The unanimous decision is among the earliest to address the validity of foreclosures done without proper documentation. That issue last year prompted an uproar that led lenders such as Bank of America Corp, JP Morgan Chase & Co and Ally Financial Inc to temporarily stop seizing homes.

Wells Fargo and U.S. Bancorp lacked authority to foreclose after having "failed to make the required showing that they were the holders of the mortgages at the time of foreclosure," Justice Ralph Gants wrote for the Massachusetts court.

In a concurring opinion, Justice Robert Cordy lambasted "the utter carelessness" that the banks demonstrated in documenting their right to own the properties.

Massachusetts Secretary of State William Galvin said he agrees with the ruling, which he said demonstrates the need for judicial review of foreclosures in the state to give homeowners more protections.

Courts in other U.S. states are considering similar cases, and all 50 state attorneys general are examining whether lenders are forcing people out of their homes improperly.

In the Massachusetts case, U.S. Bancorp and Wells Fargo had said they controlled through different trusts the respective mortgages of Antonio Ibanez and the married couple Mark and Tammy LaRace, who lost their homes to foreclosure in 2007.

"It is the first time the supreme court of a state has looked straight at securitization practices and told the industry, you are not immune from state statutes and homeowner protections," Paul Collier, a lawyer for Ibanez, said in an interview.

The Supreme Judicial Court also rejected the banks' request that the ruling apply only in the

future, leaving homeowners who had already been foreclosed upon without a remedy.

**2.** Rinegard-Guirma v. Bank of America, 10-1065-PK, in opinion by Judge Garr King). The public interest is served by ensuring that foreclosure sales only occur when there is no defect in the preceding property transaction

3. Federal Circuit Courts have ruled that the only way to prove the perfection of any security [including promissory note] is by actual possession of the security. Current or prior possession must be proved up. Where the complaining party cannot prove the existence of the note, then there is no note.

*See Pacific Concrete F.C.U. V. Kauanoe*, 62 Haw. 334, 614 P.2d 936 (1980), GE Capital Hawaii, Inc. v. Yonenaka 25 P.3d 807, 96 Hawaii 32, (Hawaii App 2001).

**4.** To recover on a promissory note: the Note and Trust Deed owner must prove:
(1) the existence of the note in question;
(2) that the party sued signed the note;
(3) that the foreclosing party is the owner or holder of the note; and
(4) that a certain balance is due and owing on the note. *See In Re: SMS Financial LLC. v. Abco Homes, Inc. No.98-50117 February 18, 1999 (5th Circuit Court of Appeals.)*
*Volume 29 of the New Jersey Practice Series, Chapter 10 Section 123, page 566, emphatically states*, "…; and no part payments should be made on the bond or note unless the person to whom payment is made is able to produce the bond or note and the part payments are endorsed thereon. It would seem that the mortgagor would normally have a Common law right to demand production or surrender of the bond or note and mortgage, as the case may be. *See Restatement, Contracts S 170(3), (4) (1932); C.J.S. Mortgages S 469, in Carnegie Bank v, Shalleck 256 N.J. Super 23 (App. Div 1992),* the Appellate Division held, "When the underlying mortgage is evidenced by an instrument meeting the criteria for negotiability set forth in N.J.S. 12A:3-104, the holder of the instrument shall be afforded all the rights and protections provided a holder in due course pursuant to N.J.S. 12A:3-302″
Unequivocally, the Courts rule is that in order to prove the "instrument", possession is

mandatory.

*See Matter of Staff Mortg. & Inv. Corp., 550 F.2d 1228 (9th Cir 1977).* "Under the Uniform Commercial Code, the only notice sufficient to inform all interested parties that a security interest in instruments has been perfected is actual possession by the secured party, his agent or bailee." Bankruptcy Courts have followed the Uniform Commercial Code. In Re Investors & Lenders, Ltd. 165 B.R. 389 (Bankruptcy.D.N.J.1994), "Under the New Jersey Uniform Commercial Code (NJUCC), promissory note is "instrument," security interest in which must be perfected by possession.

### 5. State of Ohio v. GMAC Mortgage

GMAC Mortgage Continued to File False Affidavits in 2009 and 2010 "Stephan" has been a team leader in the foreclosure department of GMAC Mortgage for years, including through at least August 2, 2010. Stephan had been an employee of GMAC Mortgage, or affiliates, for approximately 5 years.

In a December 10, 2009 deposition, in a Florida state court foreclosure case, Stephan testified that his team brought to him approximately 10,000 affidavits and assignments in a month for him to sign (2009 Deposition, p.7, ls 18-20).

In spite of the Florida Foreclosure Decision, Stephan testified that he did not sign the affidavits based on his personal knowledge and that he relied on others (2009 Deposition, p. 10, ls 6-15). However, he also testified that his team did not verify the accuracy of the information: "They do not go into the system and verify the information as accurate. We are relying on our attorney network to ensure that they are asking for the correct information." (2009 Deposition, pp. 12-13, ls 16-25 and 1-4). Stephan knew or should have known that these hundreds of affidavits would be filed in Ohio courts and relied upon by Ohio Common Pleas Judges in deciding whether the plaintiff in the particular case had a right to foreclose on Ohio residents.

When Stephan executed an affidavit, he testified he did not ascertain who the current promissory note-holder was (2009 Deposition, p. 31, ls. 12-14), even though his affidavits always stated or implied that plaintiff was the holder of the note. The agents of GMAC Mortgage prepared these affidavits to mislead the courts in Ohio on such matters as who kept the applicable records, who the holder of the note was, the amount due to whoever the holder of

the note was, and whether proper notice alleging default had been sent to the borrower.

In spite of his lack of personal knowledge, Stephan swore in the hundreds of affidavits he signed for Ohio courts that "I have personal knowledge of the facts contained in this affidavit," or equivalent words. Stephan signed hundreds of these false affidavits, and Defendants caused hundreds of these false affidavits to be filed in hundreds of mortgage foreclosure cases in Ohio.

Stephan – claiming to be an officer of MERS – signed for many Ohio foreclosure cases Assignments of Mortgage falsely claiming that he assigned a borrower's mortgage and note from MERS to the plaintiff , even though he did not have the authority of MERS to assign a note to any party.

Stephan signed hundreds of affidavits outside of the presence of a notary public (2009 Deposition, p. 13, ls. 10-17) that were filed in Ohio foreclosure cases.

Stephan was acting within the scope of his employment with GMAC Mortgage when he executed the false affidavits, when he executed the affidavits outside the presence of notaries public and when he execute the false assignments of note from MERS to plaintiffs in Ohio mortgage foreclosure cases.

Ally and GMAC Mortgage had authority over the right to control the actions of Stephan and benefited financially from the actions of Stephan. The actions of Stephan were part of the business plans of Ally and GMAC Mortgage.

GMAC Mortgage has outsourced various pieces of the foreclosure process. For instance, GMAC Mortgage contracts with Fiserv, Inc. ("Fiserv") to provide such computer services as recording payments received from, and amounts allegedly due, lenders. Fiserv advertises that it is a "leading global provider of information management and electronic commerce services" which provides "solutions for optimizing all aspects of the payments mix to help create efficiency and growth."

GMAC Mortgage employees executed thousands of false affidavits and purported to enter payments, failures to pay, and other information in computers for the Fiserv system.

It is Fiserv that creates and maintains the records and calculates the amounts allegedly due from borrowers.

In a June 7, 2010 deposition, in a Maine mortgage foreclosure, Stephan testified that he

did not have "any knowledge about how GMAC ensures the accuracy of the data entered into the system" (2010 Deposition, p. 30, ls. 10-13).

Lender Processing Services, Inc. ("LPS") provides a separate system that creates documents for GMAC Mortgage in the foreclosure process and acts as an intermediary between attorneys for GMAC Mortgage and GMAC Mortgage in the foreclosure process (2010 Deposition, pp. 35-42 and 56-57).

As part of GMAC Mortgage policy, Stephan did not read every paragraph of the summary judgment affidavits he signed (2010 Deposition, pp.61-64) that were prepared by LPS. The summary judgment affidavits signed by Stephan contained inaccuracies.

GMAC Mortgage knew or should have known that failure to supervise the accuracy of the input of information into, maintenance of information in, and calculations provided by, the outsourced computer systems and document preparation would lead to errors and inaccuracies that would violate GMAC Mortgage's duty to consumers to accurately account for payments received by consumers and payments owed by consumers.

GMAC Mortgage and Ally learned of the 2009 Deposition soon after that deposition, but took no corrective action.

During the 2010 Deposition, Stephan testified: (a) he signed the affidavits outside of the presence of a notary (p. 56, ls. 10-28); (b) when he signed a summary judgment affidavit he did "not inspect any exhibits attached to it" (p. 54, ls. 12-25); (c) he did no read every paragraph of the summary judgment affidavits he signed (p. 60, ls. 24-25 and p. 62, ls. 1-3); and (d) the process he followed "in signing summary judgment affidavits is in accordance with the policies and procedures require of you by GMAC Mortgage." (p. 64, ls. 8-14).

GMAC Mortgage and Ally learned of the 2010 Deposition in June, 2010.

7. Sanctions in Maine in 2010

The Defendant in the Maine Mortgage Foreclosure moved for sanctions for a false affidavit signed by Stephan and relied upon by the court in granting summary judgment for plaintiff. The Maine court held oral argument on the motion on September 1, 2010.

On September 24, the Maine court vacated the grant of summary judgment and also addressed the motion for a protective order that had been filed that would have prohibited the dissemination of the deposition of Stephan taken in the case. The Maine court said that

"Plaintiff points to the embarrassment of GMAC and its employees have suffered, and will continue to suffer, from the posting of excerpts from Stephan's deposition transcript on an Internet blog." The Maine court denied the motion for protective order, noting "Stephan's deposition was taken to advance a legitimate purpose..."

The Maine court then granted the motion for sanctions filed by the borrower, awarding to the borrower the borrower's attorneys fees: "Rather than being an isolated or inadvertent instance of misconduct, the Court finds that GMAC has persisted in its unlawful document signing practices long after and even in the face of the Florida Court's order, and that such conduct constitutes 'bad faith' under Rule 56(g). These documents are submitted to a court with the intent that the court find a homeowner liable to the plaintiff for thousands of dollars and subject to foreclosure on the debtor's residence. Filing such a document without significant regard for its accuracy, which the court in ordinary circumstances may never be able to investigate or otherwise verify, is a serious and troubling matter."

Since the oral argument in the Maine mortgage foreclosure case was held on September 1, 2010, GMAC Mortgage knew after September 1 that sanctions were imminent.

On September 17, 2010, Ally sent a memo to "GMAC Preferred Agents" directing these agents that GMAC Mortgage "may need to take corrective action in connection with some foreclosures" in 23 states, including Ohio. In addition, for these states, including Ohio, it directed the agents: (a) "Evictions: Do not proceed with evictions, cash for keys transactions, or lockouts. All files should be placed on hold, regardless of occupant type. (b) REO Closings: Do not proceed with REO sale closings."

In spite of his admissions in his depositions, Jeffrey Stephan is still employed by GMAC Mortgage, reflecting the fact that his actions were in accordance with GMAC Mortgage policy.

In light of the actions of Ally, GMAC and Stephan, the Attorney General of Ohio has reasonable cause to believe that GMAC employees in addition to Stephan have signed false affidavits, assignments of notes and other documents in connection with foreclosure cases.

On September 27, 2010 the Ohio Attorney General sent a letter to the General Counsel of Ally expressing concerns over GMAC Mortgage's actions and requested that Ally/GMAC Mortgage describe the steps being taken to remedy the problems identified, the steps to alert Ohio courts of the problems, including cases that had already proceeded to a foreclosure

judgment, and the actions to ensure that the problems related to its foreclosure affidavits not re-occur in the future. On September 30, Plaintiff requested that Ally/GMAC Mortgage agree not to proceed towards a judgment, sale, eviction, or transfer of any property until there was agreement that proper remedial action had been taken.

GMAC Mortgage and Ally claim that they will review the affidavits signed by Stephan and other GMAC Mortgage employees since July of 2009, but not affidavits signed before July of 2009. They have not yet reviewed the majority of the affidavits signed by Stephan or other GMAC Mortgage employees. Ally/GMAC Mortgage said they would review all the affidavits by the end of October, 2010, but did not indicate they would review any Assignments executed by Stephan, even though they were improperly prepared and executed.

Ally/GMAC Mortgage said they would substitute new affidavits for improper affidavits, without any assurance of which affidavits they would consider improper and while still asserting they would rely on their outsourced system for the calculation of amounts allegedly due. Ally/GMAC Mortgage has not yet explained how it planned to determine from its review of outsourced computer records who the holder of the note and mortgage was in any particular case, which of necessity must involve a review of the actual note, mortgage and any assignments or endorsements.